CITY OF RALEIGH v. CARY K. DURFEY.

(Filed 1 October, 1913.)

1. Municipal Corporations—Adverse Possession—Title—Limitation of Actions.

A municipality may acquire title to real property by adverse possession under the statute when held under the same conditions as required of individuals to ripen their title thereby.

2. Municipal Corporations—Sidewalks—Legislative Powers.

A city may sell and convey strips of land owned by it on each side of its market house, in the shape of sidewalks, used for the convenience of hucksters therein and other tenants thereof, when such sale is authorized by statute, and the adjacent owners of property have acquired no rights in these walks incident to the use and enjoyment of their property.

3. Same—Deeds and Conveyances—Right of Abutting Owners.

The city of Raleigh, being authorized by the Legislature to sell its market house, including two walkways, one on the north and the other on the south side, each about 6 feet wide, which were used for the convenience of the hucksters and other tenants, with doors opening from each stall, where farm wagons would back up with produce for sale, under the provisions of the statute, contracted to sell the market house, together with these walkways, to the defendant, who refused the deed upon

the ground that the plaintiff was without authority to sell the two walkways included in the transaction, as they were a part of the two public streets of the city about 50 feet wide on each side of the market house, and that the owners of the property, having a sufficient sidewalk provided for them, on their side of these streets, had acquired rights therein: *Held*, the walkways for the market house were not a part of the public street, and the owners on the opposite side of the streets could acquire no rights in them.

4. Municipal Corporations—Deeds and Conveyances—Constitutional Law—Sidewalks—Legislative Powers.

There is no constitutional restriction upon the right of the Legislature to authorize a municipality to sell its public sidewalks, under the circumstances of this case, and a sale made in pursuance of the powers conferred is valid.

CONTROVERSY without action, heard by *Cooke, J.,* September Term, 1913, of WAKE, upon the following agreed state of facts:

1. The city of Raleigh is a municipal corporation, chartered under chapter 59, Private Laws of North Carolina, Session 1913, as amended, which charter was adopted on the first Tuesday in April, 1913, by a majority of the then registered and qualified voters of the city of Raleigh, and that James I. Johnson is mayor of the city of Raleigh.

2. That the city has undisputed possession of and claims to own property situate on Fayetteville Street, lying between East Hargett and East Martin streets, and running back to Wilmington Street, lying between Exchange Place north, or Market Street, and Exchange Place south, and known as the market house, together with the lot upon which the said building is situate, said property measuring 40.2 feet on Fayetteville Street, running back in a rectangular shape 210 feet to Wilmington Street, measuring 40.1 feet on Wilmington Street.

3. That subsection I, section I, article 5 of the said charter, relative to the powers given the board of commissioners of the city of Raleigh, reads as follows: "To open new streets, change, widen, extend, and close any street that is now or may hereafter be opened, and adopt such ordinances for the regulation and use of the streets, squares, and parks and other pub-

lic property belonging to the city as it may deem best for the public welfare of the citizens of said city."

4. That Exchange Street south, from building line to building line, is 50.4 feet, and Exchange Street north, from building line to building line, is 51.6 feet; that the sidewalks on the north and south sides of the market building measure 6.9 feet from the curb of said sidewalks to the building line of said building, which sidewalks run from Fayetteville Street to Wilmington Street on both sides; that Exchange Street north is 34 feet wide from curb to curb and Exchange Street south is 35 feet wide from curb to curb; that from building line on the south line of south Exchange Street to the building line of the north side of north Exchange Street is a distance of 155.10 feet. Said Exchange streets north and south are only 210 feet long.

5. That Exchange streets north and south are now and have for many years been used in connection with the market, produce wagons backing up to the sidewalks on either side of the market, on Exchange streets north and south; the horses to said wagons facing north and south, as the case may be, and standing at right angles to the north and south sides of the said market; that the length of a horse and wagon is between 16 and 18 feet.

6. The Legislature of North Carolina, Session 1913, authorized the city of Raleigh to sell said property, including the sidewalks on the north and south sides of said building, at a minimum price of $80,000, said act forming chapter 315 of the Private Laws of North Carolina, Session 1913, a copy of which act is hereto attached and marked "Exhibit A."

7. Said property was duly advertised for sale and sealed bids requested, together with a deposit of a certified check for $5,000.

8. On 11 August, 1913, said bids were duly opened by the commissioners of the city of Raleigh, when and where it was found that Cary K. Durfey, as surviving executor and trustee of the estate of Florence P. Tucker, deceased, was the highest bidder at the price of $90,575, and that his bid was made on

condition that the title to said property should be satisfactory, a certified check for $5,000 having accompanied said bid in accordance with the requirement aforesaid.

9. That the bid of said Durfey as aforesaid was accepted by the said city, and subsequent to said acceptance he assigned his bid, under the same conditions as the bid was made, to Cary K. Durfey, trustee, which assignment was accepted by the said city of Raleigh.

10. That after reasonable time had been given the said Durfey, trustee, to investigate the title to said property, a deed in the usual form and with the usual warranty or warranties, conveying the said building and the said lot, including the sidewalks on the north and south sides, in fee simple, was tendered to said Durfey, trustee, and a demand made for the balance of the purchase price, namely, $85,575, the payment of which was refused by said Durfey for the reason that he stated that the city of Raleigh had no right even under the act aforesaid to sell the sidewalks on the north and south sides of said building, and for the further reason that the city of Raleigh could show no title to part of the property.

11. That the old maps of the city of Raleigh show that in 1834 this was a solid block of property owned by various individuals. On 12 December, 1846, Matthew Shaw gave to the commissioners of the city of Raleigh a deed conveying a tract of land 70 feet by 210 feet, bounded on the west by Fayetteville Street, on the south by the line of the late John Marshall, on the east by Wilmington Street, and on the north by the line of the city market lot.

12. That many years ago the courthouse of Wake County was burned, together with numerous records of conveyances, etc., and that no conveyance of the city market lot referred to in the deed of Matthew Shaw to the commissioners of the city of Raleigh can be found.

13. That there is on record a deed, registered in book 11, at page 190, in the office of the register of deeds for Wake County, from William Hill to Fannie Murden, which states

that the lot conveyed by Hill's deed to Murden faces on Martin Street and runs back 68 feet to the line of lot of Matthew Shaw.

14. That it is 70 feet from the northeast corner of the intersection of Fayetteville and Martin streets to the southeast corner of the intersection of Exchange Street south, and Fayetteville Street. That so far as the records of Wake County show, the aforesaid lot conveyed by Matthew Shaw to the city of Raleigh was the only piece of property that he owned in Lot No. 114, which was the south part of the old block as shown by the city maps, bounded by Hargett, Martin, Wilmington, and Fayetteville streets, and measuring about 420 by 210 feet.

15. That there is no record as to whether Exchange Street north was opened by the city out of the property bought by the city for that purpose or by condemnation, but the old maps show that Exchange streets north and south were not streets that were laid off by the State of North Carolina, in the plan of the city of Raleigh.

16. That Exchange Place south covers a part of the property purchased from Matthew Shaw, the balance of said property being occupied by a portion of the market house.

17. That old inhabitants state that the present site, together with the streets thereon, were used for the market house prior to 1860; two wooden structures, namely, the city market and the fire and police house, being situate thereon; that these wooden structures were burned about 1864, and that the present building was built by the city of Raleigh as it now stands about 1867, and has been continuously used as a city market house since that date.

18. That the city of Raleigh has been in undisputed adverse possession under known and visible bounds of the land occupied by the market house for at least sixty years, occupying the same and collecting rents for the same.

19. That subsequent to the opening of Exchange streets north and south, numerous stores have been erected on the north side of Exchange Street north, or Market Street, with

entrances facing thereon, and likewise numerous stores have been erected on the south side of Exchange Street south, with entrances facing on said street, all of which belonged to private parties.

20. That for many years both Exchange Place north and Exchange Place south have been shown on the maps of the city of Raleigh as being of the width above set out.

21. That while the sidewalks on the north and south sides of the market house are paved and curbed, they are used principally by persons trading and trafficking with the produce wagons and for giving access to the side doors of the market, and to a much less extent by persons passing to and from Fayetteville and Wilmington streets.

The questions presented in this controversy without action are as follows:

1. Has the Legislature of North Carolina the authority to authorize the city of Raleigh to include in the sale of the market house the sidewalks on the north and south sides of the market-house building?

2. If the Legislature has no such right, does it make null and void the entire act authorizing the sale of said property?

3. Has the city of Raleigh a good title to the said market property, not including the said sidewalks?

And the parties hereto submit this controversy without action to the court and agree to abide by the decision and the termination of the same.
> JOHN W. HINSDALE, JR.,
> *Attorney for the City of Raleigh.*
> W. H. PACE,
> *Attorney for Defendant.*

The court rendered judgment for plaintiff. Defendant appealed.

*J. W. Hinsdale, Jr., for plaintiff.*
*W. H. Pace for defendant.*

BROWN, J. It is contended by the defendant, as a reason why he should not be required to complete his purchase:

1. That the plaintiff has no valid title to part of the property purchased.

2. That the plaintiff has no right under the act of the Legislature to sell the sidewalks on the north and south sides of the market-house building.

The property purchased by the defendant is the market-house property of plaintiff, situated in the center of Exchange Place. The records of Wake County were partially destroyed by fire some years ago, but it is admitted that the plaintiff has a perfect paper title to all of the property sold except to a portion of it now covered by a part of the market-house building.

It is admitted that the plaintiff has been in undisputed actual adverse possession under known and visible lines and boundaries of the entire land and property for sixty years, occupying the same and collecting the rents.

Upon these facts it would seem to be plain that plaintiff has acquired an absolute title to the property. One of the methods of acquiring title to land is by adverse possession. *Mobley v. Griffin,* 104 N. C., 115. We know of no reason or authority by which a municipality is excluded from that rule and rendered incompetent to acquire title by that method.

The principal controversy seems to be as to whether plaintiff can legally convey the narrow 6-foot strip on north and south sides of the market house running from Fayetteville to Wilmington streets.

From the facts stated in the case agreed, it is manifest to us that these narrow strips bordering the north and south sides of the market house are not sidewalks, in the ordinary acceptance of that term, or parts of the public streets of the city. They were placed there and evidently elevated a few inches above the street, for the protection of the market house when it was built, and for the convenience of the butchers, hucksters, and other tradesmen who occupy the market-house stalls. The doors to a dozen of these stalls open on these strips on each side of the market house, and are used by the occupants and their customers. If the market house itself is removed, these strips would be of no use to any one, but would be a dangerous obstruction in the center of Exchange Place.

It is admitted in the case agreed that the public streets on both north and south sides of this market-house property are known as Exchange Place north, and Exchange Place south, each being about 50 feet in width. It is thus manifest that this was all an open space at one time, and that the market house was built in the center of it.

These narrow strips bordering the market house are not, a part of the public street, but are used daily for the number-less carts and wagons to back up against to unload their produce into the stalls opening on the strips. They afford pro-tection as abutments to the market-house building as well as a convenience to its occupants.

It is contended that the abutting property owners on south and north sides of Exchange Place have 'an interest in the maintenance of these strips as sidewalks which cannot be law-fully taken from them.

It is almost beyond the ken of mortal man to see what bene-fit these narrow borders to the market house can be to those landowners on the north and south sides of Exchange Place. There is a spacious sidewalk on each side in front of their property leading from Fayetteville to Wilmington streets. Their interest in these narrow strips is more imaginative than real. But as they are not in any sense public streets, they can have no interest in them.

Assuming, for argument's sake, that these strips are public streets, the power of the General Assembly to authorize the sale of this property, including the so-called sidewalks, is un-doubted, there being no constitutional restriction. *Moore v. Meroney,* 154 N. C., 158; *Marietta v. Henderson,* 121 Ga., 399; *Williams v. Corey,* 75 Ia., 194.

As the landowners abutting on Exchange Place are not complaining, and can sustain no possible injury, their pecun-iary rights need not be considered.

As is said by the Supreme Court of Iowa in a somewhat similar case: "The owners of lots abutting on the west side of the narrowed street could not enjoin the council from carry-ing their proposed action into effect, on the ground that they

would be damaged thereby, inasmuch as the damages relied on by them and shown by their evidence were imaginary rather than actual." *Williams v. Corey, supra.*

In this case the court held that the taking of 12 feet from a street, thereby reducing it to 41 feet, was no injury to property owners on the other side of the street. No property is taken from these landowners, and they are not directly damaged, and as is said in *Hyde Park v. Dunham,* 85 Ill., 569, "Municipal authorities of cities and villages are vested with complete control over streets, and may contract or widen them when in their opinion the public good so requires them, and damages sustained in consequence of the exercise of such power when property is neither *taken nor directly damaged* thereby are too remote and contingent to be allowed."

The cases of *Moose v. Carson,* 104 N. C., 431, and *Southport v. Stanly,* 125 N. C., 466, cited by defendant, have no application to the facts of this case.

The judgment is

Affirmed.